Good morning, my name is Joy Bertrand, I represent the Plaintiff Appellant Rubia Morales-Alfaro. I would like to allocate 12 minutes to my opening argument and save 8 minutes for rebuttal. Keep an eye on the clock. A woman walks up the beach just north of Tijuana looking for a CBP officer to surrender to and ask for asylum. She has with her a backpack that has a couple snacks and a bottle of water and a pregnancy test and an ultrasound that she had received about a week before confirming she's pregnant. And she does find that CBP officer who she says shoved her to the ground and kicked her in the flank. When she is presented at the first of two immigration detention centers she tells them immediately I'm pregnant, they kick me and I'm worried, I'm in pain and I'm scared for my baby, I think I need a doctor. And that is what sets off the events of this case. Counsel, where is your client now? She's in Arkansas. Okay. I had a question about whether the forward-looking claims here for injunctive relief are moot because in order for her to bring those forward-looking claims she would have to be in the exact same facility under the exact same conditions. And I don't, it doesn't sound like that is the case. Not currently, no. Okay. She's currently out of custody. The government asked that the court take judicial notice and the court granted that request that there is a warrant that's been issued for her, a deportation warrant. And we supplemented that with new information that there's been a request to quash that. I'm not an immigration lawyer so I will tell you that's the extent of my knowledge about that proceeding. But I guess I would say, Your Honor, Melendrez v. Arpaio talks about this standing issue and forward-looking claims such as what Ms. Morello-Salfaro has brought here. And I would proffer to the court that she has a couple reasons why she has standing to bring that claim. First, there's a real risk that she could return. And she could return to, I can't guarantee where she would go, but there is a risk she could return to this facility. But where is that pleaded? It's pleaded from the outset in her third, well, starting with her First Amendment. That the same detention center operated by CoreCivic, that she's pleaded that she is likely to end up in the exact same place even though she's now in Arkansas. She's in Arkansas now. Your Honor, that's correct. I don't know where she'll end up. She could end up in OMDC in San Diego. She could end up anywhere in the nation. Well, that's why it's speculative that she would have. Melendrez was all about one place. This is about an infinite or a very large number of possible places if she is, in fact, re-detained as opposed to removed. I would also suggest to the court that the relief that she was seeking, the prospective relief that she seeks, does not apply simply to OMDC. Because what she talks about in her complaint, starting with the First Amendment complaint and through the Third Amendment, is this is the condition for pregnant women in immigration detention. This is a system-wide problem where ICE does not provide the care, the medical care, necessary for this serious medical need. And that these conditions go beyond simply the medical care and go into issues of unconstitutionally punitive conditions. So why isn't that more of a practice and policy claim that I don't think is before us? I mean, so where in your complaint should we look to find the best allegations we can rely on to find that she's still facing likelihood of these injuries? She discusses this from the outset. I'm going to work off of the Third Amendment complaint because that was the most recent one. And that's the one that the district court made the Rule 12 rulings on. She discusses in her Third Amendment complaint more than just a pattern, a policy. She's not simply objecting to a policy. She's saying this is what is in practice in these immigration detention centers. And she cites, for example, the Wolf litigation that happened in Arizona where the Arizona district court found those immigration detention conditions to be unconstitutionally punitive. So... I'm sorry. What in the complaint shows that your client is still facing likely injury from these conditions? You'd said that she does, in fact, allege that she's likely to be back in this or perhaps some similar facility. But where can we find that in the complaint? I didn't see it, so I'm asking for your help with a cite. The Third Amendment complaint discusses specifically the risk of her returning to immigration custody and, I believe, cites the statistics about the odds of receiving asylum. And if she didn't receive the asylum, then she's back in immigration custody. Okay, so it alleges custody generally, not here. Correct. And immigration custody could be brief. If she's actually removed from the country, she wouldn't be in detention. And assuming that she is re-arrested. Your Honor, it could be brief and it could be lengthy. With what was the status of the case in 2021 when the Third Amendment complaint was being evaluated, taking that complaint and the four corners of that complaint, she was saying, I'm not on a bond right now seeking asylum. That could change, could change very quickly, and I could end up back in immigration detention facing these same conditions that are a national problem. I experienced, she says, I experienced these at the initial detention center outside of Tijuana and then at the Otay Mesa Detention Center. And so she can say, I don't know that this asylum claim is going to work. I don't know if it's going to be accepted. And then I may end up back in custody facing these same conditions. How have you, under the, turning now to the summary judgment piece of it, have you pleaded enough or did you show enough, I'm sorry, at summary judgment to meet the California standard for causation, negligence, reasonable medical probability? Where is that? I'm sorry, not did you plead it, did you establish it on summary judgment? Did you come forward with evidence? You have expert reports. Do the experts anywhere opine that it's probable that the negligence caused her harm? Yes. And where would we find that? I would refer the court to Dr. Natel's report, and this is Volume 2 of the excerpts of the record at 72 through 75 is when he fleshes out his opinion. And there's two kinds of harm being discussed here, Your Honor. There's first the miscarriage itself and whether or not this could have been avoided. And the first thing he says is that while the overall pregnancy may not have been altered, had care been provided expeditiously, the patient would have endured less uncertainty and potentially less pain. That's at 75. And he says she was exposed to unrelenting stress and acute physical trauma upon her arrival in the United States, which are reasonable contributing factors to the pregnancy loss at 72 of the record. That establishes under California law that there is a reasonable certainty that, at the least, had the United States and CoreCivic provided Ms. Morales Alfaro with any obstetric care, any specialty care, that her damages would not be the same. She would have – maybe if she had been provided that emergency care upon intake on December 22, maybe this miscarriage would not have happened. But then they let her suffer for 12 days. And that's where Dr. Nattel says that pain is not to be discounted. And that is its own injury. And the pain, the worry, the wondering, let's say this miscarriage, once it started, wasn't going to stop, emergency care would have allowed her to at least know that and would have relieved her of the pain. And that's what the United States and CoreCivic really cannot run from, particularly at the Rule 56 stage, where the inferences and the facts have to be given to the plaintiff. Here, Dr. Nattel's opinion and the factual record itself of the nurses even saying, I'm going to ask for a doctor, you're going to get a doctor, I want you to have – I'm putting in an urgent request. That never happens. So even the people on site trying to treat her are recognizing that we can't do anything more. I think that the combination of the facts in the record and her medical records are in the third volume of the excerpts of record, and they're quite lengthy. But starting from the outset, you have the nurses saying, we're going to get you a doctor, we're going to get you seen. We have, I believe it's Nurse Rosenblatt saying, I'm putting in an urgent request for an OB consult. Never happens. And the other standard that I think the court may find helpful to consider when looking at the California medical malpractice standard is the government's own standards for pregnancy care in detention. And that's their own ICE national standards that also bind them to the standards established by the National Commission for Correctional Health Care. And in those standards, they are required to provide this care. This isn't optional. It's not discretionary. When a high risk pregnancy presents, they are required to get high risk pregnancy care, specialty care, even if it's off site. None of that happened here. That combination certainly at least creates the inference that we have met the burden under the medical malpractice standard for California. I would like to briefly address the other Rule 12 ruling because the court touched on it a little bit in discussing the policy and practice type claim. And that is the issue of discretionary immunity. That is one of the bases that the district court uses to dismiss the constitutional claims in the third amended complaint. I thought that was the basis for dismissal of the FTCA claims. I believe you're correct about that as well.  Discretionary function exception to the FTCA. Yes. And here, her claims are rooted in specific acts that occurred to her under the FTCA. She's not saying this policy is bad and you should change the policy. She is saying this policy was implemented and in implementing this policy or not implementing the very policies that they've established under the PBNDS and the National Correctional Health Care Standards. Pardon me. Had they followed their standards, I would have been in a different situation. Do those FTCA claims rise and fall with the causation of the other tort claims? In other words, if the district court erred with respect to the discretionary function doctrine, you then went to summary judgment on what appear to be parallel tort claims. Similar. Any difference between that that would change the result of the summary judgment claims as to the dismissed claims? I don't believe so, Your Honor. Okay. And with regard to the summary judgment claim, I'm keeping an eye on the clock here and being careful. I just want to make one quick note. And that is the government in course of its extreme position that in essence there was no pregnancy. This blighted ovum explanation is that there's just an egg or like a rogue egg that has gotten loose in the uterus. It doesn't have an embryo and it will be absorbed into the body. The facts presented and the expert opinions presented by Dr. Spencer in particular directly contradict that assertion. And we see between the first ultrasound and then the second ultrasound taken in January the crown rump length of the embryo growing. We see it continuing to develop. And we also have in the record confirmation of a heartbeat. If this was simply a blighted ovum, there would be no heartbeat. I'm going to step back and reserve the rest of my time for rebuttal. Thank you, Counselor. Thank you, Your Honor. So we're going to hear from Ms. Sotomayor first on behalf of the United States. May it please the court. Good morning, Your Honors. Assistant United States Attorney Stephanie Sotomayor on behalf of the United States. I'd like to reserve 10 minutes for the co-appellee, Cora Civic, please. I'll watch the clock. All right. Thank you. This is a medical negligence case where plaintiff's own expert has admitted that the overall pregnancy outcome may not have been altered had care been provided sooner. That's at 2 ER 72. There exists no issue for trial on that topic. The district court correctly ruled that the appellant did not prove negligence by the United States caused miscarriage. In order for her claim to succeed, the appellant had to establish actual cause that some negligence by the United States caused her miscarriage. Counsel, what if what if the negligence consisted of not the cause of the miscarriage, but the cause of the suffering that accompanied it? For example, if someone has appendicitis, obviously the government doesn't necessarily cause that. But if it's left untreated for too long and the person suffers a lot more than they would have had to, isn't that possible for that to be a negligence claim? Sure, Your Honor. But in this case, the plaintiff with regards to the United States, the plaintiff only plead or pleads that pain and suffering damages as they pertain to that medical negligence claim causing the miscarriage. I'm not sure I understand your answer. If she is pleading that the negligence caused unnecessary pain and suffering, regardless of whether there was causation of the miscarriage, you're saying that's not part of the pleading? Correct, Your Honor. So my understanding is that the plaintiff has pled one claim in her fourth amended complaint against the United States, and that's medical negligence causing the miscarriage. And one of the damages resulting from that was the pain and suffering correlated to the miscarriage. And there is no standalone claim for pain and suffering. And back to actual cause, the appellant had to prove using competent expert testimony and to a reasonable degree of medical certainty that in the absence of the United States negligence, she would not have had the miscarriage. She failed to do this. Do you agree that the lack of care to a pregnant woman was contrary to the ICE stated policies for treatment of pregnant detainees? I believe in this case she did receive proper care, and I think it did comport with ICE's standards and policies. In this case, it wasn't the United States' burden to disprove causation. I'm sorry, back on the, I guess the tort claim, and that was dismissed on that basis. And so then we're looking at a different standard of review. So while it may or may not have come out at summary judgment about whether they followed it, I believe the complaint read in the light most favorable of the plaintiff. Why couldn't that be taken to establish a violation that's not subject to the discretionary function doctrine? I apologize, I'm not sure I understand the question. So the allegations were that they didn't follow the policy.  And the tort claims against the government were dismissed on sovereign immunity grounds because of discretionary function. But haven't we said that if it's a failure to follow the policy, that that isn't covered by sovereign immunity? And doesn't the complaint plead as much? Yes, Your Honor, and that is true. But with regards to the discretionary function exemption, in this case, plaintiff alleges that ICE didn't follow certain policies or standards, but doesn't actually point to specific policies that ICE didn't follow. And so with regards to the DFE, the United States isn't liable for the actions it took in this case because those were discretionary acts. And there's an exception to that exception where if there's a directive that the United States employee didn't follow, then perhaps the DFE wouldn't apply. But that's not an allegation plaintiff makes here.  I'm not sure why I'm looking at the third amended complaint in paragraphs, part of paragraph 220, where there are specific detention standards. And she specifies the provision of food, water, hygiene products, the shackling of pregnant women, sleep and medical care. And you were just saying that wasn't sufficiently precise. Why isn't that specific enough? And my apologies. I should clarify on that note, too. One point on that is plaintiff's own experts don't point to any of the items you just listed as having resulted in her miscarriage. Well, that goes to summary judgment, not the dismissal. That has nothing to do with the pleading standard. I'm asking about the pleadings, dismissal on the pleadings. Why isn't that sufficiently precise for the purpose of withstanding a motion to dismiss for lack of specificity, which is what you're arguing? I understand, Your Honor. So it is a part of the ICE policies that you are not to shackle pregnant inmates. That is correct. And I believe some of the items you listed as well, the other items you listed. But my understanding is in this case the DFE does apply still because all of the ways in which all of these behaviors were done while plaintiff was being held in detention, which was run by CoreCivic, and the United States supervision of CoreCivic in its operation of OMDC, that was a discretionary act. If plaintiff has noted that the claims that were dismissed, the federal tort claims that were dismissed are parallel to the remaining claims that went to summary judgment. So I think you'd suggested there was a lack of causation. The district court didn't dismiss on those grounds. Why could we affirm on the dismissal of those claims only an alternative ground that they would have been granted summary judgment? I believe, and please correct me if I'm mistaken, are you referring to the NIED claim? The negligent infriction of national insurance? I mean, I think that you have a parallel set of claims. The claims that preceded that you've just said don't meet the causation standard on summary judgment because of expert affidavits. But then you have the same tort claims that were, the constitutional tort claims that were, or the, I'm sorry, the claims 6, 10, and 11. The other claim, the FTCA claims, if those are roughly the similar, district court maybe erroneously dismisses them under the discretionary function doctrine. But the parallel claims go to summary judgment. I think you were asking us, there's no causation for the FTCA claims even if it got the discretionary function doctrine wrong. Can we do that? I believe so, Your Honor, because we still have that issue where plaintiff's experts haven't proven causation. But not on these particular claims because they weren't at issue in summary judgment, the FTCA claims. I believe that's correct, Your Honor. But we can anyway because they're the same claims or similar claims and we have failed proof.  So I believe that the FTCA claims, the court's ruling on that issue, the negligence-causing miscarriage issue, mooted the DFE claims.  And I am running short on time, Your Honor. If there are no further questions, I will give the remainder of my time. Do you have a case for us on the point you just made? That a grant of summary judgment on similar claims with the same elements moots an erroneous dismissal of those parallel claims? I do not. But I'm happy to brief that issue for you, Your Honor. Okay. Thank you. Good morning, Your Honors. Kevin Nguyen on behalf of CoreCivic. If I may, I'd like to take a moment to briefly respond to plaintiff's suggestions that defendants took an extreme position in this case by pointing out the fact that the evidence was undisputed. Her miscarriage was not viable from the very beginning. That's not true. CoreCivic acknowledges that a miscarriage is an extremely traumatic experience and sympathizes that no one should ever have to experience it. But as plaintiff's doctors told her, unfortunately, miscarriages are common in the first trimester. And sometimes they can happen spontaneously through no fault of her own or anyone else's. And that's what the record in this case showed. The district court was correct to dismiss all claims because plaintiff failed to meet her burden at the summary judgment stage to prove causation. Setting the miscarriage aside, why isn't there causation? Is there not at least a tribal issue as to causation of the pain and suffering? The district court correctly ruled that that was a new theory of liability that plaintiffs did not pursue throughout the litigation. We didn't conduct any discovery on it because that was never really her claims. But even if she had pled such a claim, she failed to establish causation for it. I think counsel just explained that this claim of an independent harm was based on a 12-day delay in receiving specialty care. But the record is undisputed that CoreCivic was not responsible for the provision of medical care. The United States was. The United States plaintiff stipulated that the United States was responsible for not only the medical care, but also the medical decisions related to that care, which includes whether and when plaintiffs received specialty care. Counsel, I want to go back to your statement that there's no separate allegation about pain and suffering. I mean, I'm this is I'm looking at the fourth amended complaint. For example, paragraph 180, the repeated breaches of these duties, which were discussed previously, caused Ms. Morales pain, suffering and emotional distress. And, you know, there are other let's see, there are other things here, too, that are similar. So I'm not sure why that doesn't suffice to put that issue before the court. That was never the theory of liability that plaintiff pursued. But even if she well, that's in the pleadings. Certainly at the summary judgment stage, your honor, she can't merely rely on the allegations in her complaint or parties can't rely on the pleadings. That's true. So you're saying that there's no evidence that she suffered pain or anxiety. I thought that Dr. Mattel's letter does discuss that to some extent. A couple of points, your honor, on that. She testified at her deposition that all her pain and suffering, which are parasitic damages to the miscarriage, arose from the miscarriage itself. There is no other evidence from her that she suffered any independent harm from the miscarriage. She could have submitted a declaration. It was as simple as that. But there was no evidence of that because that was not her claim. With respect to Dr. Mattel's expert report, I believe he referred to certain emotional stressors, which included her horrible experience in Guatemala with gang violence. The alleged kick in the abdomen by a border patrol officer, which he referred to as police violence. And then his conclusion that she was incarcerated. So it was the fact of her incarceration, but it was never based on any evidence. And he didn't offer that opinion to a reasonable degree of medical certainty. He didn't refer to any of the alleged conditions that plaintiff claimed to course of a breach. There was no reference to restraints. The record was undisputed that she was not restrained, your honor. There was no reference to cold temperatures that made it impossible for her to sleep, inedible foods. She was on a pregnancy diet. She had access to blankets. The evidence, I believe, was undisputed that the temperatures were comfortable. But if they weren't comfortable for her, they could have been made comfortable. But she never complained or raised that issue to anyone. I think her other allegations about the conditions were that she was placed in restrictive – well, she had restrictive movement. But the record was undisputed that she wasn't placed in restrictive housing, but rather a dorm-style room where she was free to move around the housing unit from 5 a.m. to about 9.30, which is count before bedtime. And detainees can't move around after bedtime for obvious reasons for safety and security. And during the daytime, she had access to – unfettered access to outdoor recreation in the attached rec yard. And I think the other issue was feminine hygiene. I think sanitary pads. The record was also undisputed that they were available for free as needed. So she didn't offer any opinions on those conditions, much less that those conditions caused her any harm independent of the miscarriage. Mr. Nguyen, on the mootness question, is there anything in the record that identifies how many or where there are other detention facilities that CoreCivic is managing? CoreCivic manages – I don't know if it's in the record, but CoreCivic does manage several dozen facilities all across the United States. But on the mootness point, Your Honor, her claim would be unmoot or not moot only if she were to be placed at OMDC, the same detention facility, and pregnant and subject to the same allegedly punitive conditions. There's no evidence that those conditions existed at other facilities. I think there were some government reports and news articles that plaintiffs cited. But those reports were largely relevant because they involved other facilities, other detainees, and other time periods. And nothing contained in those reports was evidence of causation for either her miscarriage or any other harm independent of the miscarriage. I see my time is running low. If there are any questions the panel has, I'd be glad to answer them at this time. Nothing for me, no. Thank you. Thank you, counsel. First, starting regarding the miscarriage, I would note that the United States and CoreCivic are subject to different standards here. The United States, because they had to be sued for Judge Burns under a medical negligence standard, is subject to the medical negligence standards. I do believe those have been met for Rule 56 purposes. But CoreCivic is subject only to a general negligence standard. They want to piggyback with the United States, but the standard for them is different and it's less demanding. And as to both standards, I would note that what the plaintiff does not have to do is show that this conduct was the sole factor. It has to show it was a substantial factor. And those are California Jury Instructions 400 and 430. And 431 of the Jury Instructions also allows for the jury to consider independent causes of the same injury. To me, that makes me think of a law school bar exam on proximate cause, right? It doesn't have to be the sole factor. And it does nothing to address the pain, suffering, emotional distress claim. The defendants are saying she hasn't claimed it. I, while you were talking with my colleagues, pulled up the third amended complaint and paragraphs 72 through 75, specifically discuss the PBNDS as it applies to pregnancy health care in these detention facilities. And the fourth amended complaint discusses those same standards at paragraphs 54 through 56. They're discussed extensively through the Summary Judgment Briefing as well. And Ms. Morales-Alfaro, when deposed by the defendants, by my count, mentions the pain, the physical pain that this caused 16 times. Well, this is an indefinite reference. If it's the miscarriage that caused the pain, then there has to be causation related to the miscarriage. If the pain is separate from that, that's a different story. What did she testify to? She testified that as the miscarriage was occurring, she was repeatedly reporting pain, that she was experiencing the pain. And as the court used the appendicitis example, this is as if she'd come in and said, I think my appendix or my gallbladder or whatever hurts. If they said, we're going to get you emergency care and let that last for 12 days, that suffering and that additional danger to her is a separate consideration. And Dr. Nattel talks about that in his report. They don't have to have caused the appendicitis to have caused her the pain and suffering of refusing her care. And as to CoreCivics- What is the relevance of CoreCivics' argument that they cannot themselves offer care? They have to go through the United States? Well, I don't think it is. It may be relevant. I don't believe it's an accurate assertion. And that's because they have three different ways that they're required to ensure this care. First is the Woods v. Olson lawsuit where they agreed that they, CoreCivic, would ensure that the standards required under the National Correctional Health Care Standards and PBNDS are met for medical care. CoreCivics bound itself to that. CoreCivics' operating agreement with the United States regarding that facility requires them, not the United States, to ensure that these health care standards are met. And the health care standards themselves require correctional officers to be trained. And the discussion here, this is the standard PC04, health training for correctional officers. And the discussion there says because correctional personnel are often the first to respond to problems, they must be aware of the potential for emergencies that may arise, know the proper response to life-threatening situations, and understand their part in the early detection of illness and injury. And then they specifically carve out, correctional staff should receive additional training on these special health topics if relevant to the services provided by the facility, pregnancy, and labor considerations. They accepted these standards. They said under three different circumstances, yes, that's our job. They cannot contract it away. These are non-delegable duties. They remain responsible for this health care. They're able to call 911. They're able to get an ambulance if they need to. I know you're over your time, but she's not detained now, right? That is correct, Your Honor. Is she out on bond, or what is the situation? I think the fugitive disentilement doctrine is off the table because she filed a motion to reopen. Is that correct? That is correct, Your Honor. Okay, so she filed a motion to reopen, and there's no threat of her being detained? It could be denied. And there's nothing to say that once the proceedings are reopened and she appears before an immigration judge and presents her asylum case, that that's going to be accepted. So she has an order of removal? Correct. That's what was issued with the warrant. Okay. All right, does anyone else have any questions? I don't. Okay. Thank you, counsel. Thank you. Morales v. The United States is submitted, and the session of the court is adjourned for today. Thank you very much, counsel. Thank you. All rise. This court for this session stands adjourned.
judges: GRABER, WARDLAW, JOHNSTONE